VICTOR POTHIER *vs.* THE REID AIR SPRING COMPANY.

Third Judicial District, New Haven, June Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

Upon appeal from a directed verdict, this court must assume the truth of the appellant's testimony, although contradicted, if the jury could reasonably have found the fact or facts which such evidence tended to prove.

The defense of illegality may be raised, though it be not pleaded, in an action upon a contract, if its unlawful character appears upon its face, the surrounding circumstances are before the court, and the question fundamental in the case.

The right of a creditor to sue his debtor for money loaned is never affected by the fact that there exists collateral security for the debt or by the fact that such security is legal or illegal, valid or invalid.

If the complaint in such an action is otherwise legally sufficient, it is not impaired by the presence of superfluous allegations concerning the collateral security.

A contract by a corporation to purchase its own stock is *ultra vires* and void as opposed to public policy, unless it comes within either of the two permissible exceptions set forth in § 3429 of the General Statutes.

The fact that a corporation has received and retained benefits under an unlawful contract to purchase its own stock, will not estop it to raise the defense of illegality, since the law cannot consistently compel it to do what it is forbidden to do.

Pothier *v.* Reid Air Spring Co.

In the present case, the defendant corporation obtained money from the plaintiff, giving as collateral security six shares of its own stock and at the same time executing an agreement, through its president, whereby it agreed to repurchase the stock on a given date for a named sum at the plaintiff's option. The complaint contained two counts, the first for money loaned, and the second for breach of the written agreement. The trial court directed a verdict for the defendant on each count. *Held:*

1. That the trial court erred as to the first count, since the allegations and the evidence offered in support of them, if believed by the jury, were sufficient to support a recovery.

2. That there was no error in the direction of the verdict on the second count, the agreement relied upon being illegal and void.

3. That, inasmuch as the record did not disclose whether or not the stock which the defendant pledged to the plaintiff had been acquired by it in accordance with the provisions of § 3429, this court could not pass upon the plaintiff's claim that a recovery upon the second count could be justified upon the theory that since the whole transaction was void, and since he acquired no title to the stock under the pledge, he was entitled to the return of his money.

Argued June 10th—decided September 19th, 1925.

ACTION to recover a sum of money alleged to have been loaned to the defendant, brought to the Superior Court in New Haven County and tried to the jury before *Marvin, J.;* the court directed a verdict for the defendant, and from the judgment rendered thereon the plaintiff appealed. *Error and new trial ordered.*

The plaintiff alleges in the first count of this action that on April 28th, 1923, he loaned to defendant $540, payable August 1st, 1923, and received therefor as security six shares of the capital stock of defendant; that on August 1st plaintiff demanded of defendant payment of this sum, and offered to return to the defendant the security aforesaid, and that defendant failed to pay him the above amount. In the second count it is alleged as follows:

"(1) On April 28, 1923, the plaintiff placed in possession of the defendant, through its president and agent, the sum of $540, and received from the defend-

ant, through said president and agent, six shares of stock in the defendant corporation, together with a written statement, a copy of which is as follows: 'New Haven, Conn., April 28, 1923. The Reid Air Spring Company has this day sold to Victor Pothier six shares of The Reid Air Spring Company's capital stock, par value $100 per share and hereby agrees to purchase the said six shares from said Victor Pothier for $540 on August 1, 1923, providing the aforesaid Victor Pothier decides to sell said shares. The Reid Air Spring Company, Edward Reid, Pres.'" (2) that on August 1st, 1923, plaintiff requested return of the $540, and offered to return the shares of stock; (3) that since then plaintiff has at all times been ready to return the shares, but defendant has refused to pay him this sum "claiming that the president had no authority to make said writing set forth in paragraph 1 of this count"; (4) that defendant retains, and refuses to return to plaintiff, the sum received by it from him.

The answer is a general denial of all allegations of both counts of the complaint, and further alleges a sale by defendant to plaintiff of six shares of its stock, for which plaintiff paid $540, and also (3) that "the defendant expressly denies the right and authority of any of its officers or agents to make any such agreement as set forth in paragraph No. 1 of the second count of the amended complaint."

At the conclusion of the hearing the trial judge directed a verdict for the defendant, and afterward denied a motion to set the same aside, and judgment was rendered thereon. By agreement of the parties and consent of the judge, a summary of the evidence adduced at the trial was made and is printed in the record instead of a full reproduction. The plaintiff offered evidence as follows:

The defendant was a corporation, organized in 1922

under the laws of the State of Connecticut, and located in the city of New Haven, engaged in making air springs for automobiles. At no time was the defendant insolvent. No dividend was ever paid. During the early part of April, 1923, the plaintiff requested employment of the defendant, and then he and the president and treasurer of the defendant had a few discussions as to the employment of the plaintiff, who expressed his desire to learn the mechanism of the air spring then manufactured by the defendant, and to become the distributor of these air springs in the State of California. The plaintiff was told by these officers of the company that while it was not a requirement that the State distributors hold stock, yet it was preferable. Early in the month of April, 1923, the plaintiff entered into the employment of the defendant, and remained in its employ, working as a mechanic on the air springs, until November 1st, 1923.

Between the early part of April, 1923, and April 28th, 1923, the plaintiff was approached on a number of occasions by the president and treasurer of the defendant and requested by them to purchase some of its stock. This the plaintiff declined to do, stating that he had no funds available. These officers then requested the plaintiff to make a loan to the company of about $500 for a period of three months, and a few days later the plaintiff reported that he could borrow the money from his mother, and would loan the defendant the sum of $500, provided that he was given security. These officers then agreed to give the plaintiff for security six shares of stock in the company at $90 per share. The loan was increased to $540 to cover the value of the six shares of stock. On April 28th, 1923, the plaintiff delivered to the president of the company the sum of $540, with the understanding that there was to be delivered to the plaintiff, as security

for the loan, six shares of stock, together with the written instrument hereinbefore printed and known as Exhibit C, and that on August 1st, 1923, when the loan was repaid, the certificate of stock was to be canceled. The president .delivered the $540 to the treasurer, which went into the treasury of the defendant. On April 28th, 1923, Exhibit C was delivered by defendant's president to the plaintiff, and on May 8th, 1923, a certificate for six shares of stock of the company.

During the period of the actual employment of the plaintiff in the company there was no further discussion of the plaintiff going to California as the distributor of air springs for the company. On August 1st, 1923, the plaintiff offered to return the certificate of stock to the president and treasurer of the defendant company, and the plaintiff requested these officers to repay the loan. They explained to the plaintiff that the company was not then financially able to repay the loan and requested him to wait until September 1st. On September 1st, 1923, the plaintiff again requested repayment of the loan and offered to return the certificate. This was at the office of the company, and the plaintiff's conversation was with the president. The president informed the plaintiff that the company was just as bad off then as it was on August 1st, and requested a further extension of one month. The plaintiff again waited and at the expiration of one month again offered to return the stock and requested repayment of the loan. The loan was not repaid. At all times from August 1st, 1923, and during the trial, the plaintiff was ready and willing to return the certificate.

Upon the trial the defendant offered evidence as follows: Early in April, 1923, the plaintiff called at the office of the defendant company and asked the president of the company for employment, stating that

he had been discharged by the Westinghouse Air Spring Company, and that he wanted to learn the mechanism of the Reid air spring and become the distributor of them for the company in the State of California. The president told the plaintiff that it was desirable that distributors become stockholders. The plaintiff again called on the president and the latter agreed to put him to work on the assembling bench. He went to work for the defendant company about the first week in April, 1923, and was laid off this employment on November 1st, 1923.

While the plaintiff was employed by the company the president introduced him to the treasurer, and the plaintiff stated to the treasurer that he desired to buy some of the defendant company's stock. The plaintiff desired to become a stockholder because he feared that someone else would get the territory. The treasurer told the plaintiff that the par value of the stock was $100 per share, but that he would let him have six shares for $540. The plaintiff agreed to purchase six shares of stock. On April 28th, 1923, the plaintiff delivered the sum of $540 to the president of the defendant company and requested a certificate of six shares of stock in the company, and also requested the president to give him an agreement to buy back the stock on August 1st, 1923, in the event that the plaintiff did not go to California on or before that date, and in the event that he did not sell his property on or before then. Thereupon the president delivered to the plaintiff the written instrument, Exhibit C. At the time of making this written instrument it was the intention of the president to cancel the certificate of stock should the plaintiff return it on August 1st, 1923. Some days subsequent to April 28th, 1923, the certificate of stock was delivered to the plaintiff at the order of the president. On August 1st, 1923, plaintiff did

not offer to return the stock, but in the last part of
September or first of October plaintiff asked for the
money and offered to return the stock. Later the
plaintiff was told by the officers of the company that
the money could not be returned and that they were
so advised by the company's attorney. The plaintiff
then requested the president to give him a note for the
money, and this was also refused. The company at no
time borrowed the $540 from the plaintiff. The trans-
action was not a loan, but merely a purchase of stock.
The president of the company gave a repurchase agree-
ment, but had no authority to enter into such an agree-
ment. Parts of the by-law defining the powers of the
president are as follows:

"The President shall be the chief executive officer
of the company and shall exercise the general powers
and duties usually vested in the president of the or-
dinary business corporation, and, in the absence of a
general manager appointed by the Board of Directors,
shall perform all the acts incidental to such office, or
as prescribed by the Board of Directors. . . . He shall,
jointly with the secretary, sign all certificates of stock,
and, with the treasurer, sign and execute all deeds,
leases, contracts, agreements, mortgages, transfers and
other instruments and obligations which the Board of
Directors may order to be executed, or which may be
proper or necessary in carrying on the business of the
corporation."

Further facts appear in the opinion.

*David M. Reilly,* with whom was *Frank W. Daley,*
for the appellant (plaintiff).

*Thomas R. Fitzsimmons,* with whom, on the brief,
was *Benjamin F. Goldman,* for the appellee (defend-
ant).

KEELER, J.  The trial judge held that the instrument of sale or return, Exhibit C, was illegal, contrary to public policy and in contravention of the statute relating to purchase by a corporation of its capital stock, and that this illegality so tainted the whole transaction between the parties, as to prevent a recovery for money loaned, as claimed in the first count of the complaint, and also for the cause of action as sought in the second count.  This claim is not raised by the answer of the defendant, unless the allegation of want of authority of the president to conclude a transaction of the nature developed by Exhibit C can be held to cover the point on which the verdict for defendant was directed.  The contract, Exhibit C, if illegal, was illegal upon its face, and the surrounding circumstances were before the court, and the question was fundamental in the case, so that we think the position of the case brings it within the exception recognized in *Davis* v. *Hemming,* 101 Conn. 713, 727, 728, 127 Atl. 514, and that the court was justified in its action in considering this point.

Reserving for the present a detailed examination of the question of the illegality of the instrument, and assuming that the transaction was properly so regarded, we proceed to examine the claim that the illegality of the collateral security went to the loan itself and prevented recovery on the first count.  The document itself, Exhibit C, is of such wording as to properly be used as collateral to a loan.  It creates in effect a privilege to tender six shares of stock to the company and receive therefor $540.  It is what is known in the language of the stock market as a "put." Such a contract is in stock dealings frequently used as collateral to a loan.

In this situation the law is clear that the plaintiff could pursue all of his remedies for recovery upon the

indebtedness alleged to be due him, one of which was
an action upon the contract of indebtedness itself
without regard to the collateral pledged to secure it.
*Stebbins* v. *Kellogg,* 5 Conn. 265, 268; *In re Waddell-*
*Entz Co.,* 67 Conn. 324, 336, 35 Atl. 257; *Robinson* v.
*Hurley,* 11 Iowa, 410, 79 Amer. Dec. 497, and note,
505; *Polhemus* v. *Prudential Realty Corporation,*
74 N. J. L. 570, 577, 67 Atl. 303; 31 Cyc. 868,
869; 21 R. C. L. 685; Jones on Collateral Securities
(3d Ed.) § 589; Colebrooke on Collateral Securities
(2d Ed.) § 113. The first count in the complaint is
framed to recover for an indebtedness, a loan from
plaintiff to defendant, and is adequate and sufficient
for that purpose. The nature of the collateral pledged
does not affect the transaction, whether good or bad,
valid or invalid. It is true that this count contains
an allegation of an offer to return the collateral, and a
refusal to accept it. While a proper allegation to make,
it was unnecessary, as appears by the authorities just
cited, and it in no way impairs the sufficiency of the
complaint. The summary of the evidence for plain-
tiff contains matter sustaining the allegations of this
count, and although contradicted by evidence adduced
by the defendant, there remained a question of fact
for the consideration of the jury, and the issue of fact
should have been committed to the jury. Upon ap-
peal from a directed verdict, this court must assume
the truth of the appellant's testimony, though contra-
dicted, if the jury could reasonably have found the
fact or facts which such evidence tended to prove.
*Hayes* v. *New York, N. H. & H. R. Co.,* 91 Conn. 301,
99 Atl. 694. The court erred in directing a verdict for
defendant upon the first count.

The second count of the complaint is based upon the
instrument of sale and return itself, Exhibit C, and
the trial court rightly held that the illegality of the

contract thereby evident upon its face prevented a recovery. In *Martin Tire & Rubber Co.* v. *Kelly Tire & Rubber Co.*, 101 Conn. 534, 539, 126 Atl. 697, we have recently held a contract by a corporation to buy back its own stock is *ultra vires* as opposed to public policy. General Statutes, § 3429, provides two ways in which a corporation may acquire and hold its own stock, one to prevent loss upon a debt previously contracted, and the other method after approval of stockholders owning three fourths of its capital stock, at a meeting warned and held for that purpose. It does not appear from the record that either of these conditions are present in the case. See also *Crandall* v. *Lincoln,* 52 Conn. 73, and *Buck* v. *Ross,* 68 Conn. 29, 35 Atl. 763. It is not necessary to again recite the objections to such a procedure, as giving preference to plaintiff over other stockholders and perhaps over creditors. Plaintiff claims that defendant is estopped from raising the point just dealt with, by reason of having taken the plaintiff's money and receiving the consequent benefit. It is sufficient here to quote the concluding paragraph of the decision in *Martin Tire & Rubber Co.* v. *Kelly Tire & Rubber Co.,* 101 Conn. 534, 541, 126 Atl. 697: "We do not mean to be understood as acquiescing in the claimant's theory, that if the defendant corporation had in fact received a consideration for its illegal contract, it ought to be compelled to do that which the statute forbids it to do."

Plaintiff further contends that the complaint and the facts present a case permitting a recovery for money had and received, even though the contract be illegal as *ultra vires* and against public policy, in that in such case the whole contract contained in the instrument was void, and he received no title whatever in the stock transferred to him, and so was entitled to have his money back. Assuming that the extremely liberal

and favorable construction of the complaint contended for might be made, we are met by the fact that the record does not give adequate information for us to pass upon the claim. Among the questions left open is that of where the defendant got the stock it sold. Stock in Connecticut corporations is ordinarily acquired by subscription and then belongs to its stockholders. The company can hold what is called "treasury stock," only if acquired by it in accordance with General Statutes, § 3429, just referred to. The query at once arises: Where did the company get the stock it sold? We do not know. The record is incomplete.

There is error and a new trial is ordered.

In this opinion the other judges concurred.